NEW YORK PRACTICE REPORTS. 315

Pacific Steamship Co. agt. Com'rs of Taxes and Assessments.

# SUPREME COURT.

THE PEOPLE ex rel. THE PACIFIC MAIL STEAMSHIP COMPANY agt. THE COMMISSIONERS OF TAXES AND ASSESSMENTS FOR THE CITY AND COUNTY OF NEW YORK.

In ascertaining the value of the *capital stock* of a corporation for the purpose of *taxation*, the commissioners of taxes and assessments, where there is no sworn evidence before them, are justified in ascertaining such value from other sources, as they do in valuing real estate.

In addition to this it is equally the duty of the commissioners to consider the *indebtedness* of the corporation as reducing the actual value of the stock, and form their estimate on that basis.

All *personal property* belonging to a corporation permanently located *out of this state* is exempt from taxation here. Such property, therefore, is not to be valued as part of the capital stock of the corporation.

CERTIORARI to the commissioners of taxes and assessments of the city of New York.

*First Department, New York General Term, December,* 1873.

*Before* INGRAHAM, *P. J.,* BRADY *and* FANCHER, *JJ.*

MORRIS & BILLINGS, *attorneys for relators.*

The relators were assessed for personal property for the year 1873 in the sum of $20,000,000, which is the exact amount of their capital stock. Feeling aggrieved by this assessment they made timely application to the commissioners of taxes and assessments to have the same corrected, and thereupon F. W. G. Bellows, the vice-president of the relators, was examined under oath by the said commissioners, and his written deposition thus taken is annexed to their return to the writ of certiorari herein, and is marked schedule A.

By this deposition it appears that the Pacific Mail Steamship Company was incorporated for the purpose of building, equipping, furnishing, fitting, purchasing, chartering and owning vessels to be propelled solely or partially by the power of steam, or other expansive fluid or motive power, and to be run and propelled in navigating the Pacific ocean; that the greater portion of the operations of said company are necessarily transacted, and always have been, outside of the state of New York, and that nearly all the real and personal property belonging to said company is necessarily, and always has been, located beyond the limits of said state; that the place of business of said company is intended and used only for the purpose of the general management of its affairs, the meetings of its stockholders and board of directors, and the keeping of its general accounts and records; that schedules B and C, annexed to said deposition, contain true and accurate statements of all the personal property belonging to said company, which, on and between the first days of January and February, 1873, was situated within the state of New York, and the respective values thereof, and that all the rest of the personal property of every kind and description which belonged to said company, or to or in which it was in any way entitled or interested at the time the assessment was made, *was then permanently* located *beyond* the limits of this state.

It was claimed, on said application, that the relators could not be legally taxed for any of the property described in said schedule B, and this claim has been allowed by the said commissioners.

It was also claimed on behalf of said relators that all portions of their personal property which, on and between the said first days of January and February, 1873, were situated beyond the limits of the state of New York were exempt from taxation by the laws of said state, and that the only portion of such personal property for which they were liable to be taxed under the laws of this state for the said year 1873 was that which is described in the said schedule C, annexed to

said deposition, the aggregate value of which is $1,736,371.99. The commissioners rejected this claim of the relators to have the said assessment reduced to the said sum of $1,736,371.99, and fixed it at $6,808,927, which necessarily includes the value of personal property of the relators which, at the time aforesaid, was permanently located beyond the limits of this state.

The relators, claiming such decision to be erroneous, have taken this proceeding to have the same corrected.

I. The only evidence before the commissioners on the application to correct this assessment is contained in the said deposition of F. W. G. Bellows, the vice-president of the company, which was sworn to before one of the commissioners.

On the return of a writ of *certiorari* the court can only look at the facts returned. It will not assume that there was other evidence before the inferior tribunal to sustain its acts (*The People* agt. *Soper*, 3 *Seld. R.*, 432).

The facts contained in the said deposition are uncontradicted. The commissioners were therefore bound to act in accordance therewith (*The People* agt. *Howland*, 61 *Barb.*, p. 285).

Under the assessment law, as it stood under the Revised Statutes, and before the amendment of 1851, the assessors were bound to correct their assessment roll on the application of any person assessed, in accordance with his affidavit, made and produced to them in conformity with the statute (*Livingston* agt. *Hollenbeck*, 4 *Barb. S. C. R.*, 9 ; *The People* agt. *Supervisors of Westchester Co.*, 15 *id.*, 615). The act of 1851, amending this statute (*see Laws of* 1851, *chap.* 176, *p.* 334), takes away the *conclusiveness* of the affidavit before required, and makes it the duty of the assessors to examine under oath the person applying for a reduction of the assessment, touching the value of his property, and after such examination to fix such value as they may deem just. But this provision does not give the assessors any right to fix such value arbitrarily or capriciously, and when they have no ground

in the evidence so taken to fix a valuation different from that sworn to by the person applying for such reduction, they are bound to follow his statement under oath as much so as the assessors were bound by the affidavit formerly required (*The People* agt. *Reddy*, 43 *Barb. S. C. R.; p.* 544; *The People* agt. *Ferguson*, 38 *N. Y. R., p.* 92).

But there is no dispute about the facts, it not being pretended that the original assessment of $20,000,000 was the result of any investigation by or under the direction of the commissioners, in relation to the value of the capital of the relators, or the particular kinds of property in which it was invested, or the places in which the same was situated. It is clear, from the return, that the commissioners merely assessed the relators in the full amount of the *nominal* value of their capital, leaving them to apply for such deductions as they might be entitled to.

It was upon the application of the relators to reduce this assessment that the *first* investigation of these matters was made by the commissioners; and this deposition of Mr. Bellows contains the only information upon which their action on such application was founded. In no other way did they acquire the information which enabled them to decide that the *actual* value of the capital of the relators was $10,000,000, or that the deductions which they have allowed should be made; and they had full power and opportunity by a further examination of Mr. Bellows, or of other parties, to investigate any matter contained in his deposition, concerning which they might require further information.

II. It must therefore be assumed as a fact that, exclusive of the property described in schedule B, annexed to the said deposition of F. W. G. Bellows, and which is admitted to be exempt from taxation, the only other portion of the personal property of the relators which, at the time aforesaid, was situated within the limits of this state, is correctly described in schedule C, annexed to said deposition, and that the aggregate value thereof did not exceed the sum of $1,736,371.99;

Pacific Steamship Co. agt. Com'rs of Taxes and Assessments.

and the claim which we make is that this is the only portion of the personal property of the relators for which they were liable, under the laws of this state, to be taxed for the year 1873, the remaining portion of such personal property having been at the time aforesaid permanently located beyond the limits of this state, and therefore exempt from taxation.

III. The act which is the basis of all taxation in this state (*see* 1 *N. Y. Statutes at Large, Edmonds' ed., p.* 360) is entitled, " Of the property liable to taxation."   And in the first section of this act the *subject* of the taxation is described " as all real and personal estate *within* this state, whether owned by individuals or by *corporations.*"

This language contains an *implied* declaration that all lands and all property situated *without* the state, whether owned by individuals or corporations, is *not* liable to taxation.

IV. The proper construction of this act, so far as it relates to *individuals*, was settled by the court of appeals in the case of the *People ex rel. Hoyt* agt. *The Commissioners of Taxes and Assessments* (23 *N. Y. R., p.* 224).   It was held in that case that a resident of this state is not taxable here upon such of his personal property *as is actually situated* out of this state, and that such property is not taxable here upon the fiction that its *situs* follows that of the owner.

The opinion of the court in that case was intended to embrace only property which is *visible* and *tangible*, so as to be capable of having an *actual situs* away from the owner or his domicile.   But in the subsequent case of the *People ex rel. Jefferson* agt. *Gardner* (51 *Barb. S. C. R.*, 352), the principle is extended to capital invested in loans in other states, *taken* and *held in those states by agents.*

· Although these decisions relate merely to *individuals*, they apply with equal force to corporations, there being nothing in the opinion of the court in either case which restricts its operations to individuals.

And in the case of the *People ex rel. Bank of the Commonwealth* agt. *The Commissioners of Taxes and Assessments,*

which was decided at the *same* term of the court of appeals as the case of *Hoyt* agt. *The Commissioners of Taxes and Assessments* (*supra*), it was declared that corporations are *now* entitled to the same exemption of property from taxation as individuals ( *The People ex rel. Bank of the Commonwealth* agt. *The Commissioners*, 23 *N. Y. R.*, *pp.*, 194, 195).

Mr. ch. j. Comstock, in his opinion in the last. mentioned case, says : " The language of the statute is that all lands and personal property *within* this state, whether owned by individuals or *corporations*, shall be liable to taxation. If this language does not apply the same rule of taxation and exemption to individuals and corporations, I greatly misapprehend its meaning " (23 *N. Y. R.*, 215 *and* 216).

But the opinion of the court is principally based upon ·the change in the system of taxation of corporations effected by the act of the legislature of this state, passed April 15th, 1857.

Prior to this act the principle of taxation of moneyed corporations was that the amount of the capital, except such portion thereof as had been paid out for the purchase of real estate, was to be taken as the amount of the personal estate of the corporation for which it was to be taxed, whether it had been impaired by losses or increased by accumulated profits (*id., p.* 193).

By section 3 of the act of 1857 (*see L.* 1857, *ch.* 456) it is declared that the capital stock of every company liable to taxation " shall be assessed at its *actual* value, *and taxed in the same manner as the other personal and real estate of the county.*"

By this act two important changes were effected in the system of taxing corporations : 1st. The capital was no longer to be taxed at its *nominal* but at its *actual* value ; 2d. The *property* constituting the capital was to be taxed in the same manner as the property of individuals (*Bank of Commerce* agt. *City of New York*, 2 *Black. R.*, 629 ; *opinion of Mr. justice* Nelson, *Bank Tax Case*, 2 *Wallace*, 200–210).

NEW YORK PRACTICE REPORTS. 321

Pacific Steamship Co. agt. Com'rs of Taxes and Assessments.

In construing this section, full effect must be given to *both* of its clauses. There would be no meaning in the second clause if the only change intended by the legislature had been that contained in the first.

In the case of the *Bank of the Commonwealth* agt. *The Commissioners of Taxes* (*ut supra*), DENIO, J., says, at page 194: "In 1857 an act was passed which completely changed the system of assessment of corporations." Under this act "it is the duty of the assessors to ascertain the character and worth of the securities in which thè funds of the corporation have been invested. It is equally their duty to inquire whether any of the property into which the capital has been converted is *exempt* by law from taxation" (*id., p.* 195).

"Whether such exempt property belongs to an *individual* or to a *corporation* taxed upon its capital, *the rule is the same.* The *exempt* property is to be deducted from the aggregate valuation, and the tax is to be imposed upon the *residue*" (*id., pp.* 214 *and* 215).

V. The case of *Hayes* agt. *Pacific Mail Steamship Company*, decided by the supreme court of the United States, and reported in 17 *How. R., p.* 596, affords no guide for the decision of the question presented by this case.

It was decided in 1854, *before* the change in the system of taxation of corporations in this state, which was effected by the act of 1857, and one of the facts dwelt upon by Mr. justice NELSON in his opinion, in that case, was that "taxes had been assessed upon all the *capital* of the Pacific Mail Steamship Company, *represented by the steamers*, in the state of New York, *under the laws of that state*, ever since they had been employed in the navigation down to that time." Another essential fact, upon which the judgment in that case was founded, was that these steamers were *in transitu*, *having no situs* in California nor permanent connection with its internal commerce (*see opinion of Mr. justice* CAMPBELL,. *p.* 600).

In the present case, the irresistible inference to be drawn from the deposition of Mr. Bellows, which states that all these steamers, at the time this assessment was made, were *permanently located beyond the limits of this state*, is, that they were *not* then *in transitu*, but had an *actual situs* out of the state, and that being so, the fact, even if true, that they were registered in the city of New York, is of no importance. *See St. Louis* agt. *Wiggins' Ferry Company* (40 *Missouri R.*, *p.* 590), in which case Mr. justice HOLMES, delivering the opinion of the court, says : " The personal property of the company which is permanently located or actually situated in Illinois is, no doubt, taxable there only ; but these registered boats must be held to be taxable here only. It does not necessarily follow from this that all boats and vessels that may be registered at this port must be liable to taxation here."

But there is no evidence whatever, in the papers before the court, to show that these steamers are or ever have been registered at New York, and no presumptions in favor of it are to be indulged in.

The commissioners had full opportunity to investigate that subject, if they had deemed it important, by a further examination of Mr. Bellows or of other parties, but neglected to do so; and the argument that these steamers must have been registered in New York, as they could not legally be registered elsewhere, this being their home port, under the act of congress relating to the registry of vessels, is altogether fallacious : 1st, because there is no evidence that they have been registered anywhere ; and, 2d, because they may all have been purchased by the relators while they were in a district other than the one which includes the port of New York, in which case they were entitled to, and could only, be registered by the collector of the district where they happened to be at the time of such purchase (*see act in question*, 1 *U. S. Statutes at Large, p.* 292).

VI. There are, undoubtedly, many cases which seem to

Pacific Steamship Co. agt. Com'rs of Taxes and Assessments.

hold that the *situs* of a vessel must of necessity be the place of its registration, but a careful examination of them will show that no such doctrine has really been held, *except in cases of vessels regularly departing from and returning to the port where they were registered.*

And, upon principle, there is no reason why the fiction of law, that the *situs* of personal property follows that of the owner, which it is admitted does not prevail for the purposes of taxation in regard to other personal property, should be applied to steamships which have an *actual situs* out of this state.

VII. But admitting, for the sake of the argument, that the *situs* of these steamers, at the time of this assessment, was the city of New York, and that they were, therefore, legally liable to be taxed here, their taxable value did not exceed the sum of $2,500,000 (*see deposition of Mr. Bellows, printed papers, p. 11, fol. 30*), which sum, added to the aggregate value of the property described in schedule C, annexed to said deposition, viz., $1,736,371.99, would make the sum for which the relators were taxable, for the year 1873, $4,236,371.99 instead of $6,808,927, at which it has been fixed by the commissioners, a difference of $2,572,655.01. It is very clear that if the commissioners had assessed these steamers at a higher figure than $2,500,000, they would necessarily have valued the capital of the relators at more than $10,000,000. They could not, consistently with the deposition of Mr. Bellows, have materially reduced the figures at which he estimates the value of the other descriptions of personal property belonging to the relators, as shown in the several schedules annexed to said description.

VIII. The result is, that if the steamers described in schedule D, annexed to said deposition, should be included in the assessment, the sum upon which the relators were liable to be taxed for the year 1873 was $4,236,371.99, and if these steamers *should be excluded*, as we claim, then such sum should be reduced to $1,736,371.99, which is the aggre-

gate value of the property described in schedule C, annexed to said deposition.

IX. If the relators are not entitled to the exemption contended for, then the commissioners erred in not deducting from the actual value of the capital of the relators the amount of their debts, as shown in the said deposition of F. W. G. Bellows, and estimated in the aggregate at the sum of $2,834,398.09 (*See p.* 12 *of printed papers*). This would be a proper reduction in the case of an individual, and by the act of 1857, above referred to, the capital stock of every corporation, liable to taxation, is to be taxed in the *same manner* as the property of individuals (*The People* agt. *Ferguson*, 38 *N. Y.*, 91).

X. No difficulty arises from the fact. returned by the commissioners, that they have delivered the assessment rolls to the supervisors. The *writ of certiorari* was issued and served on them before they made such delivery (*see affidavit of O. P. C. Billings*). This arrested the rolls in their hands and stayed all proceedings upon them. And this court can direct a *writ of certiorari* to the board of supervisors to bring the assessment rolls before it, and direct its clerk to correct the same (*The People* agt. *Reddy*, 43 *Barb. R., p.* 545).

XI. Again, if the exemption contended for cannot be allowed, the commissioners erred in not deducting from the actual value of the capital of the relators the sum of $5,106,000, which is the aggregate value of the steamships included in schedule D, annexed to the said deposition.

The value of these steamships necessarily forms part of the value of said capital, as ascertained by said commissioners, and the ships themselves are exempt from state taxation: 1st, because they are employed in foreign commerce; 2d, because they are employed by the government of the United States in transporting the mails; 3d, by reason of the provision of the constitution of the United States (*art.* 1, § 10, *sub.* 2), which prohibits the state from laying any duty on tonnage; 4th, by reason of the provision of the constitu-

NEW YORK PRACTICE REPORTS. **325**

Pacific Steamship Co. agt. Com'rs of Taxes and Assessments.

tion of the United States (*art.* 1, § 9, *sub.* 5) which declares that no preference shall be given by any regulations of commerce or revenue to the ports of one state over those of another (*Gibbons* agt. *Ogden,* 9 *Wheat., p.* 498; *Brown* agt. *State of Maryland,* 12 *id.,* 419; *Passenger Cases,* 7 *How.,* 400; *The People* agt. *Brooks,* 4 *Denio,* 476; *City of New York* agt. *Miln,* 1 *Peters,* 136; *McCulloch* agt. *The State of Maryland,* 4 *Wheat., p.* 316; *Weston* agt. *The City of Charleston,* 2 *Peters,* 467; *Bank of Commerce Case,* 2 *Black,* 260; *Osborn* agt. *The Bank of the United States,* 9 *Wheat.,* 738).

E. DELAFIELD SMITH *counsel to the corporation, for respondent.*

The writs of *certiorari* in these cases were sued out to review the action of the commissioners of taxes in assessing certain corporate bodies.

They all raise, in some manner, the general questions as to what is the correct method, under the laws of this state, of assessment upon corporations; and these general questions are treated in this brief. Such questions as are peculiar to each case will be discussed in separate briefs.

The Pacific Mail Steamship Company is a New York corporation, having its principal place of business in the city of New York; but it was incorporated for the purpose mainly of establishing and running a line of steamships between ports and places on the Pacific ocean, and such has been and is its principal business.

The bulk of its actual operations are carried on and the greater part of its property has been situated outside of this state; but the general management of its affairs, including its financial concerns and corporate meetings, is carried on within this state.

The commissioners of taxes, in determining the amount for which it was to be assessed, pursued the following method, which they suppose to be that prescribed by law. They

determined, upon such evidence as was open to them, that the *actual value* of the capital stock (the nominal amount of which was $20,000,000) was $10,000,000, and deducted therefrom the cost of the real estate belonging to the company $2,091,073, for United States bonds belonging to the company $100,000, and for stock of the Panama railroad belonging to the company $1,000,000, leaving the sum of $6,808,927 as the amount upon which the company was to be assessed and taxed.

It is presumable that the commissioners, in determining the *actual value* of the capital stock, were guided, in whole or in part, by the market value or price. Whether they took into consideration the other facts which the relators spread before them, such as the location of a large part of the company's property outside of the state, does not precisely appear. The relators assume that they did not, and it is only upon this assumption that any question is raised by the record for argument and decision.

The benefit of this assumption being yielded to the relators, they deny the correctness of the method of assessment pursued by the commissioners; but it does not clearly appear what other method, in their view, the commissioners should have adopted. They must, however, insist that the commissioners should have followed one of the two following methods:

*First.*—After ascertaining the actual value of the capital stock in the manner in which they did ascertain it, make, in addition to the deductions they did make, the following: for property situated outside of the state the aggregate amounts in schedules D, E, F and G of the "statement."

*Second.*—Assess this corporation in precisely the same way as they would assess an individual, by ascertaining the amount of its *property* in this state subject to taxation, and after making the deductions required by law, take the residue, if any, as the sum upon which the tax is to be imposed, without any reference to the value of the capital stock.

I. The writ is tested June 30, 1873, and returnable on the first Monday of October following. It does not appear when it was served; but the service would not stay the action of the commissioners. It appears, by the return, that the commissioners have discharged their functions and delivered the assessment rolls to the supervisors. No correction can now be made in those rolls by any judgment against the commissioners. This *certiorari* cannot, therefore, be made effectual, and should be quashed or dismissed (*The People* agt. *The Commissioners of Taxes*, 43 *Barb.*, 494; *The People ex rel. Rapplee* agt. *Reddy*, 43 *id.*, 539; *The People* agt. *Fredericks*, 48 *id.*, 173; *The People ex rel. Marsh* agt. *Delaney*, 49 *N. Y.*, 655.)

II. The relators claim that the commissioners have not made any allowance in their favor for property situated outside of the state, nor for their indebtedness. This does not appear by the return. For anything appearing in the return, it may be that, in determining the *actual value* of the capital stock for the purposes of making the assessment, they took into consideration the *situs* of the company's property, and also the amount of the indebtedness. For aught that appears, the value of the whole stock, according to the market price, would be *twenty* millions. If they did so, and failed to allow as much weight to this consideration as it may have deserved, the error is not reviewable by this court. Their jurisdiction is conceded, and their conclusions are not impeachable, unless it appears *affirmatively* that they refused to give the relators the benefit of some distinct legal right

1. Upon what evidence they acted, in determining the *actual value* of the capital stock, does not appear. The maxim " *omnia presumuntur rite acta esse* " is to be applied in their favor. It is made their duty to assess the taxable value of property, and they are to discharge this duty by resorting to the usual modes of ascertaining such a fact. The presumption that their conclusions are correct stands until the contrary appears, not *probably*, or by *conjecture*, but with

affirmative certainty (*Oswego Starch Factory* agt. *Dolloway*, 21 *N. Y.*, 449).

III. The assessment against this company may be so presented in argument as to wear the appearance of *hardship;* but care should be taken not to hasten to the conclusion that the hardship, which must frequently result from the operation of general laws in particular cases, is a consequence of error in the interpretation of the law.

1. If an unequal, harsh or oppressive system of imposing and distributing the public burdens is adopted by the legislature, the courts can furnish no remedy. The only means of relief against an excessive imposition is by an amendment of the law and petition for restoration (*Sedgwick on Statutory and Constitutional Law*, 502).

2. In the practical working of the best system of taxation which human wisdom could devise there would still be found much inequality, of which those who felt the burden would complain, as if it were an injustice; but for such mischiefs there is no remedy which courts or even legislatures can furnish. They are inherent in the nature of the subject.

3. In cases like the present, therefore, the only function which courts can perform is to inquire what the scheme of taxation adopted by the legislature is, and whether it has been correctly interpreted and applied by the officers appointed to administer it.

IV. The various questions raised by the several cases at bar cannot be correctly determined without a reference to the theory and history of the system of taxation adopted in this state. In relation to a subject which affects so directly the personal and selfish interests of all, including the legislators who have dealt with it, and which has at one time been under the control of one interest, and at another time of another, it would be unreasonable to expect to find entire consistency and harmony, either in the theory or history of the system; but this consideration only tends to make the inquiry difficult. It does not render it useless.

V. The political economist, unembarrassed by the practical difficulties of administration, and dealing only with the question how the public revenues could be drawn with the least injury to the public wealth, and with the least inequality, would distribute the burden among the people according to the ability of each individual to bear it, and would perhaps impose a tax upon *persons* according to their several *incomes*, as the sole method of raising the entire public revenue. The practical legislator, in view of the impossibility of accurately determining the incomes of individuals, would reject such a method.

VI. The *general* solution given by the legislation of New York to this problem has been to impose the whole burden upon the *property* lying within the state, and is well expressed in the general enactment. " All lands and all personal estate within this state, whether owned by individuals or corporations, shall be liable to taxation, subject to the exemptions hereinafter specified " (*R. S., part* 1, *chap.* 13, *tit.* 1, § 1).

VII. For the purposes of taxation no *general* rule more equal or just could be devised than to estimate the property assessed according to its value, and such general rule was accordingly adopted (1 *R. S.,* 1*st ed.,* 393, § 17).

VIII. The *general* equity of this rule has, however, limitations. The ability of property to bear public burdens may be greatly affected by the manner in which it is held, the purposes to which it is applied, and the degree of individual labor and responsibility requisite to its care and preservation. If a man may take a portion of his property and have it united with the contributions of many others, and devoted to some profitable use, under circumstances involving little expense, and with complete security against responsibility for the acts of those who manage it beyond the amount of his contribution, the *value* of such property and its ability to bear public burdens may be vastly increased. Such added value may be conferred upon property by the *privilege of incorporation,* which is the gift of the state, and at the time of the last gene-

ral revision of our laws a vast amount of property was held by bodies thus constituted.

1. It may be said that the value of the property was not increased, but that the additional value was properly that of the *franchise* thus bestowed, which was separate from the property, and might, with the legislative assent, be made the subject of separate sale. It is, however, quite immaterial for the present purpose in what mode this additional value should be expressed.

2. The cases at bar furnish apt illustrations of this source of value. The Pacific Mail Steamship Company sets forth in its schedule D property worth, as it declares, more than $5,000,000, which, aside from the mode in which it is invested and employed, would not be worth over $2,500,000. And the Dry Dock, East Broadway and Battery Railroad Company allows us to believe that its franchise alone, the free gift of the state, is worth the whole amount of its capital stock, namely, $1,200,000.

A ferry company may have, as visible, tangible property, only a couple of old steamboats, worth $10,000 each; but its franchise may enable it to pay large dividends on a nominal capital of $100,000.

IX. That the additional value thus imparted to property by a franchise, or, to express it in other words, the franchise itself, should be made to bear its proportion of the public burdens, is certainly a just and sound policy, and has long been established in the legislation of this state.

1. By the system pursued in the early history of the state, corporations were not taxed at all, *eo nomine*, but in the assessment against individuals any stock in a corporate body was embraced at its *actual value* (*act of April 15th*, 1813, § 42; 2 *R. L.*, 521, 522).

2. This "*actual value*" did not depend merely upon the value of the visible and tangible property of the corporation, but upon its productive capacity, and in this way the added

value embraced in or conferred by the franchise was reached and made to bear its share of the public burden.

X. But the defects of this method are obvious. It is not easy to discover who are in fact the stockholders of a corporation. The books of a corporation in one part of the state are not easily accessible to the assessors in another part. There are no sure means of enforcing the collection of a tax against a *person* after it is assessed. Besides, stockholders out of the state could not be assessed at all by this method.

XI. It was doubtless in view of these difficulties that at the next general revision of the tax laws of the state the system was changed. Individual stockholders were no longer to be assessed for their respective shares, and the corporations were to be assessed and taxed, as for personal estate, on the nominal amount of their respective capitals, after deducting therefrom the cost of their real estate (*act of April* 23*d*, 1823; *Laws of* 1823, *p.* 390).

1. It will be observed that neither here any more than in the former method was the amount of the tax measured by or in any way made directly to depend on the value of the visible or tangible property of the corporation, or the amount of its debts. The intention to make the added value conferred by or embraced in the franchise is manifest, and the nominal capital is taken as calculated to furnish, in general, a fair representation of it.

2. There are obvious deficiencies and inequalities in this method. It takes no notice of those diminutions of capital which result from losses or otherwise; and, on the other hand, no notice of the increased value which capital stock receives from the increased productiveness of the corporate business or accumulations of surplus capital; so that if the market price of the shares should sink from *par* to fifty per cent, or rise to 200 per cent, the amount required to be paid to the tax gatherer would be unaffected.

3. A provision was indeed made by the act last mentioned whereby corporations whose profits did not exceed a certain

amount should be required to pay by way of tax a certain moderate percentage upon such profits.

XI. In the elaborate revision of 1827 the same scheme in its *general* features was preserved. Individual stockholders were made exempt from taxation on their shares, and the corporation itself was assessed and taxed on the nominal amount of its capital, deducting the cost of its real estate and the amount of its stock, if any, belonging to the state, or to incorporated literary and charitable institutions (*R. S., part* 1, *chap.* 13, *tit.* 4, § 6 ; 1 *R. S.,* 1*st ed.,* 414, 416).

1. Some exceptional provisions were for the first time introduced, which should be noted.

*a.* Manufacturing and turnpike corporations were to be assessed on the *cash value* of their stock, and it was declared that this should " be ascertained by the assessor by the sales of the stock or in any other manner " (*sec.* 7).

*b.* The provision which had long been in force permitting a reduction in the assessments of the property of individuals, and which was preserved in respect to such assessments by the fifteenth section of the second title of the chapter above mentioned, was extended to corporate bodies. The section thus extending this provision (*section* 8) was not reported by the revisers, but was added by the legislature. It certainly was an incongruity, so far as respects the taxation of the personal estate of corporate bodies, and the section introducing it was repealed in 1851.

*c.* Provision was also made allowing manufacturing and marine insurance companies, whose annual income did not exceed five per cent on their capital stock, to commute by paying in lieu of other taxation five per cent of their net income (*sec.* 11).

*d.* And turnpike, bridge and canal companies, whose income did not exceed five per cent on their capital, were wholly exempted from taxation.

2. It is worthy of notice that by the last revision the provisions for imposing taxes upon individuals and corporate bodies

were kept entirely separate and distinct, and, obviously, for the reason that the systems were so different—the one proceeding upon an actual valuation of visible and tangible property, and the other upon an assumed valuation embracing both tangible and intangible subjects—that confusion would result unless this separation was maintained. In order to apply a provision relative to the assessment of individuals contained in the second title to the assessment of corporate bodies, a special clause was deemed requisite (*sec.* 8 *of tit.* 4).

XII. The preceding review makes it manifest that in all the legislation, up to and including the last general revision, the *general* scheme of taxation, in respect of the property, other than real, of corporations did not look to any valuation of their *property as such*, or where it might be situated, or take any account of their debts in determining the amount on which they should be taxed, and such is the uniform view of all the authorities (*The Bank of Utica* agt. *The City of Utica*, 4 *Paige*, 399; *The People* agt. *The Sup'rs of Niagara*, 4 *Hill*, 20; *The Oswego Starch Factory* agt. *Dolloway*, 21 *N. Y.*, 449; *The People ex rel. Bank of Commerce* agt. *The Com'rs of Taxes*, 40 *Barb.*, 334; *The People ex rel. The Bank of Commerce* agt. *The Com'rs*, 2 *Black.*, 620).

XIII. It would not, however, be correct to say, notwithstanding the *dictum* of Mr. justice NELSON in the case last above cited, that the tax thus assessed was "like one annexed to the franchise as a royalty for the grant." It was the scheme devised to carry out the leading principle, "All lands and all personal estate within this state, whether held by individuals or by corporations, shall be liable to taxation, subject to the exceptions, &c."

1. If it was designed as a royalty for the grant of a franchise, it would follow, contrary to the emphatic enactment just quoted, that all the personal property of corporations was *exempted* from taxation.

2. If the scheme did not refer, in terms, to the personal property of corporations, it did not ignore it in fact, and the

same may be said of the franchise. It adopted a system calculated to impose upon *both* their fair share of the public burdens. It viewed the nominal capital as designed to represent, and as, in fact, representing both.

XIV. The legislation, since the Revised Statutes, has not changed the essential features of the scheme as hereinbefore presented. We mean by this that now, as formerly, it is the design of the law to view the personal estate of a co-operative body as blended inseparably with its franchise; and its value as so affected thereby that the scheme for assessing the personal estate of individuals is not to be applied to the assessments against corporations, except where it is specially so declared.

1. The act of April 15th, 1851 (*Laws of* 1851, *p.* 333), abolished section 15 of title 2, chapter 13, part 1 of the Revised Statutes, which required the assessors, upon the oath of a party that his real or personal estate did not exceed a certain value, after, in the case of personal estate, deducting his debts, to reduce the assessment to the amount sworn to; and provided another form of relief against excessive assessments by requiring the complaining party to submit to an examination upon oath, and after such examination it authorized the assessors to modify the assessment as might seem to them just. This provision was, in 1857, extended to corporations (*act of April* 15th, 1857, § 2 *Laws of* 1857, *vol.* 2, *p.* 123). The effect of this is to give the assessors power to correct an assessment, and allow them a large discretion in respect to the grounds upon which they may act.

2. In 1853 (*Laws of* 1853, *p.* 1240), some important changes were introduced into the system established by the Revised Statutes, though they have no special bearing on the present inquiry.

1st. The total exemption of companies showing they had made no profits was abolished, and instead of this all were allowed to *commute*, by paying five per cent of their profits, when such profits did not exceed five per cent of their capital.

2d. A provision was introduced making them taxable on their "surplus profits or reserved funds," exceeding ten per cent on their capital.

3. The discrimination between corporations of different kinds, founded on the nature of their business, was abandoned, and all were to be taxed upon the same rule, which was to assess them for the amount of their capital, and their surplus profits or reserved funds exceeding ten per cent on their capital, after deducting the cost of their real estate. This provision was, doubtless, suggested by the practice of many corporations to make large additions to their capital in fact, without any change in their nominal capital.

4. The act of April 15, 1857 (*Laws of* 1857, *vol.* 2, *p.* 1), introduced an important change in the principle of valuation. The capital stock, together with the surplus or reserved funds exceeding ten per cent on its capital, after deducting the assessed value of its real estate, and all stock which might be owned in other corporations liable to taxation, was to be assessed at its *actual* value. The principle of taking the nominal amount was abandoned, and that of actual value substituted in its place.

5. The expression, "*assessed* value of its real estate," has been held, on the view that all the legislation on this subject is to be construed together, to mean its value as assessed under the rules elsewhere laid down, that is to say its cost. Different constructions have also been suggested as to whether the surplus profits are to be added to the capital and the cost of the real estate then deducted, or the cost of the real estate first deducted from the surplus profits, and the remainder, if any, then added to the capital (*The People ex rel. The Citizens' Gaslight Co.* agt. *The Board of Assessors of Brooklyn,* 39 *N. Y.,* 81).

6. The object of the amendatory act last above mentioned was, doubtless, to remedy an inequality which bore harshly upon those unfortunate corporations which made little or no profit, and which yet were taxed on the same rule with those

which made large gains; and the plan fixed upon was the same which had been applied to manufacturing and turnpike companies by the seventh section of the fourth title of the thirteenth chapter, part 1 of the Revised Statutes. That section declared that the "cash value mentioned in it should be ascertained by sales of the stock or otherwise." The act of 1857 is silent as to the mode of ascertaining the value, but should receive a similar interpretation with the seventh section referred to (DENIO, *J., in Oswego Starch Factory* agt. *Dolloway*, 21 *N. Y.*, 458).

7. It would seem that the legislature, in introducing the principle of taking the actual value, should have abandoned the practice of taxing for the surplus profits or reserved funds, which enter as an element into the actual value. This incongruity seems not to have occurred to the legislature. A practical method of meeting it is suggested by DENIO, J., in his opinion above referred to.

XV. It will be seen from the foregoing review that at all times it has been, and still is, the settled scheme of our law, that the assessment of the personal estate of corporations is not to be made, like that of individuals, by taking an inventory and making an assessment of their property, and deducting from the aggregate thus found the amount of the debts, but by ascertaining by sales of the stock, and other evidence, if necessary, the actual value of the capital stock. The claim of the Pacific Mail Steamship Company, so far as it proceeds upon the view that the commissioners erred in fixing the capital at its actual value by reference to the market price, has no just foundation.

XVI. But their claim may be differently stated thus: That the commissioners properly enough considered the market price, but made an error in allowing it to control their determination; and that *in determining the actual value* they should have given more weight to the facts spread before them in the statements of the company. But the answer to this is, that the whole business of determining the actual

value of the stock is committed by law to the judgment of the commissioners, and that their conclusions cannot be set aside by the courts for error, *unless they have denied to the relators the benefit of some specific legal right.* So far as respects their action in finding the actual value of the stock, this does not appear.

1. They had before them all the evidence, and found the actual value of the stock to be ten millions. For aught that appears, its market value was twenty millions. For aught that appears, they made allowance for every one of the grounds of deduction presented to them.

XVII. It may be urged that, conceding that the action of the commissioners in determining the actual value of the stock cannot be reviewed, still, after having fixed such value, deductions should have been made therefrom for all such property in which the capital of the company was invested as was by law *exempt from taxation,* and that all its personal property *outside of this state* was so exempt.

1. The first answer to this is, that it does not affirmatively appear that the commissioners did not make allowance for this in fixing the actual value of the stock for the purposes of taxation.

2. The second answer is, that the legislature has carefully specified the deductions which are to be made from the assessed value of the stock, and this is not one of them. It is plainly the legislative intent to point out *all* the deductions to be made. "*Expressio unius est exclusio alterius.*"

3. The general features of the present scheme were introduced at the time when corporations were first assessed *eo nomine,* by the act of 1823, already referred to. At that day the instances of property being held outside of this state by domestic corporations were few and unimportant. There is no probability that the idea of exempting such property ever occurred to the legislature. The course of affairs since may have made it expedient to introduce a new exemption in consideration of property held out of the state by corporate

bodies; but this is a matter within the province of the legisla-
ture, which makes and amends, not of the courts which
declare, the law.

4. But, again, the making of any such deduction is imprac-
ticable. There is no machinery for it provided in the laws.
No such machinery is requisite in the case of an individual,
because the assessment in his case is imposed upon his pro-
perty valued *according to ordinary rules*, and all that is
requisite in his case is simply to so value his personal pro-
perty within this State. Not so in the case of corporations.
Their personal estate is not to be valued *directly* at all. It is
their stock which is to be valued; and the value of their
tangible property is but one of the elements which compose
it. The other is the added value embraced in the franchise.
The two are blended together inseparably. How are the
commissioners to determine what proportion of the value of
the capital stock is created by the property mentioned in the
schedules of the relators as situated outside of the state?

5. It may be argued that the supreme court of the United
States has, in effect, declared that investments in the bonds
of the general government are *exempt* from taxation in this
state, and must, therefore, even when held by corporate
bodies, be deducted by the commissioners from the actual
value of the capital as fixed by them; and that it has been
decided by the court of appeals that property outside of the
state is *exempt* from taxation, and that, therefore, according
to the decision of the supreme court, above mentioned, there
should be a deduction; but this plausible reasoning cannot
safely be followed.

*a.* The peculiar attitude of the United States supreme court
must be considered. Necessarily it is a jealous guardian of
the powers and rights of the general government, and it saw
that unless such a deduction was made, the government credit
could be indirectly taxed. That court does not consider itself
the best interpreter of the *intent* of state legislation. The
effect of its decision should be limited to just what was

decided, namely, that in no form, directly or indirectly, are government securities to be burdened by state taxation. It was a violent decision that there must, *quocunque modo,* be a deduction on account of the government stock (*The People ex rel. Bank of Commerce* agt. *The Commissioners of Taxes,* 40 *Barb.,* 334; *The People ex rel. The Lockport Bank* agt. *The Board of Education,* 46 *Barb.,* 588).

*b.* It is also to be considered that the arrangements of state taxation are matters of state concern only, and the federal courts have nothing to do with them (*The People ex rel. Bank of Commerce* agt. *The Commissioners* [*on appeal*], 26 *N. Y.,* 163).

*c.* The decision of the court of appeals, in the *People ex rel. Hoyt* agt. *The Commissioners of Taxes* (23 *N. Y.,* 224), is a decision not that this state *could* not impose a tax for property situated beyond its limits, but that the *general* scheme of taxation adopted did not, in its *intent,* embrace such property. As that was the case of an assessment against an individual, the machinery of taxation interposed no obstacle to carrying out this supposed legislative intent. But the decision is not applicable to the case of a corporation. The legislative arrangements for taxation in such cases do not make any provision for exempting personal property outside of the state; and it must, therefore, be assumed as the legislative intent that no such special exemption should be made.

6. The particular exemptions claimed are for property set forth in the schedules D, E, F and G. Something more definite than these schedules, and what is said about them in the affidavit, is requisite, in order to make it appear that the relators have been denied the benefit of the legal rights which, according to their view, they possess.

*a.* For aught that appears, New York is the *home port* of all the steamships named in schedule D, and if so, they are certainly taxable here (*The People ex rel. The U. S. and Brazil Steamship Co.* agt. *The Commissioners,* 48 *Barb.,* 157; *The People ex rel. Hoyt* agt. *The Commissioners, ubi supra*).

*b.* As to those items contained in schedule G, consisting of moneys in the hands of foreign bankers and others, they may be nothing but ordinary debts, which are taxable in the domicile of the person to whom they are due.

7. It is quite apparent that the relators have pretty much succeeded .in escaping the taxation everywhere else which they are seeking to avoid here. They do not pretend that they are taxed anywhere else for their enormous property invested in steamers. They do, indeed, say that they are taxed in San Francisco for whatever property they have there, but they do not condescend to give us any figures, which they lavish so freely in other places.

8. In the views we have thus far taken, the point so much discussed in several cases in the books, and as to which conflicting judicial opinions have been expressed, namely, whether assessments of the capital stock of corporate bodies are really assessments of their personal property or of the franchise, has been deemed not material, and as rather a controversy about words. In the view taken in these points, the intent of the legislature has been to indirectly impose a tax upon the property of corporations, *as blended with and affected by the franchise.* But if anything turns upon this point thus disputed, the weight of reason and of authority in this state favors the conclusion that the tax is imposed upon the capital stock without reference to the property in which it is invested.

*a.* Mr. justice DENIO was of the opinion that until the act of 1857 the tax was imposed rather upon the franchise, without reference to the property in which the capital was invested ; but that the act last mentioned changed the principle (*see his opinion in the People ex rel. agt. The Commissioners of Taxes,* 23 *N. Y.*, 192).

*b.* Mr. justice NELSON, of the United States supreme court, in the *Bank Tax case,* already cited, expressed a similar opinion.

*c.* Mr. justice COMSTOCK, in *The People ex rel. The Bank*

*of the Commonwealth,* was of opinion that the tax was *always* imposed in respect of the property.

*d.* But four of the judges, in the case last mentioned, are believed to have entertained the opinion that the tax was always imposed rather on the franchise and without reference to the corporate property; and the general term of this district, Mr. justice SUTHERLAND delivering a very able opinion, took the same view (*The People* agt. *The Commissioners of Taxes,* 40 *Barb., ubi supra*).

9. If this view, more extreme than the one we have endeavored to maintain, be adopted, the conclusion certainly follows that the claim of the relators has no foundation.

10. Upon the claim that the commissioners should have deducted the indebtedness of the company, the decision in *The People* agt. *Ferguson* (38 *N. Y.,* 89) should be noticed.

*a.* This case seems to have been argued *upon the concession* that all *indebtedness* of a corporate body should be deducted from the value of the capital in making the assessment, the only question being whether a contingent liability should be held equivalent to an indebtedness; and, consequently, the point now under discussion was not argued at all. The truth is, that the deducting of debts from the value of the personal estate has nothing to do with assessments against corporations. It was originally introduced and always applicable only in respect to assessments against individuals (*The People* agt. *The Board of Education of Lockport,* 46 *Barb.,* 588).

*b.* The case seems to have received very little attention, either from the counsel or the court. But one judge appears to have considered it, and he seems to have been under the influence of misapprehension. It did not occur to him that the market value of the stock of the corporation depends, among other things, directly upon the amount of its indebtedness, and, consequently, that when the capital stock is valued by a reference to the market price, its indebtedness is, in fact, already deducted.

XVIII. We make the distinct point, that in assessing the personal estate of a corporation, by taking, according to the statute, the *actual value* of its capital stock, its indebtedness is, in fact, deducted, and the claim for another deduction on the same account is an absurdity.

LASTLY. The writ of *certiorari* should be quashed or dismissed for the reason stated in the first of the above points. If the merits are considered, there should be judgment in favor of the respondents, with costs.

INGRAHAM, *P. J.*—The decision of this court in the several cases of the railroad companies,* disposes of the questions raised in this case in regard to the indebtedness of the company. This case differs from those referred to, in the fact that no valuation of the stock was furnished by the officers of the company.

The commissioners, as in the other cases, valued the stock at its par value, $20,000,000.

The officers of the company objected, and furnished a statement of the property and debts of the company, and thereupon the valuation of the capital stock was reduced one-half, $10,000,000. From this was deducted the value of their real estate $2,091,073, United States bonds held by them, $100,000, and Panama railroad stock held by them amounting to $1,000,000, and the commissioners assessed the value at the balance, $6,808,937.

In regard to the valuation of the stock, the commissioners, not having any sworn evidence before them, were justified in ascertaining such value from other sources, as they do in valuing real estate. In the *People* agt. *Commissioners of Taxes* (23 *N. Y.*, 192, 194), DENIO, J., says: If it were alleged that this (the nominal capital) did not represent its true value, it would be their duty to look at its market price, and, if necessary, to ascertain the character and worth of the securities in which its funds had been invested. The

---

* See *Dry Dock & East Broadway R. R. Co., etc.,* agt. *Cunningham, etc.,* 45 *How.*, *p.* 458.

market price of the shares would, ordinarily, furnish a practical test, but either the assessor or the tax-payer would have a right to examine and have an estimate made of the value of the securities.

I may add to this, in addition, it would equally be the duty of the commissioners to consider the indebtedness as reducing the actual value of the stock, and form their estimate on that basis.

The valuation was reduced one-half, a sum much larger than any indebtedness of the company, and there is no ground for supposing the commissioners did not consider such indebtedness in making the assessment.

The only question, therefore, which remains, is whether the company was not entitled to a deduction of the amount of their personal property which was permanently located without the state.

The proof shows that the greater portion of the personal property of the company was permanently located beyond the limits of the state of New York; that the ships are used exclusively in the navigation of the Pacific ocean, and never touch at any port in this state.

The proof also shows a large amount of coal for the use of the vessels, also out of this state in a foreign country; also vessels in process of construction abroad, to be used in the Pacific ocean, and that the company is taxed on all its property in California.

I am of the opinion that this property comes within the exemption of the statute. The general law as to taxation declares what shall be the subject of taxation. All lands and all personal estate within this state, whether owned by individuals or corporations, shall be liable to taxation, subject to the exemptions hereinafter specified (1 *R. S.*, 387).

In the case of *The People ex rel. Hoyt* agt. *The Commissioners of Taxes* (23 *N. Y.*, 224), the court of appeals construed this statute as not allowing the personal property of an individual in another country to be liable to taxation.

This rule was, at that time, applied alike to individuals or corporations, and the effect of it was to exempt from taxation all personal property belonging to an individual or to a corporation permanently located out of this state.

That still remains the law of the state; and the personal property of an individual or of a corporation, permanently located abroad, is no more subject to taxation here than the real estate, unless changed by the provisions of the act of 1857, page 1.

This provides that the capital stock of every company liable to taxation, except such part of it as shall have been excepted in the assessment roll, or as shall have been exempted by law, &c., shall be assessed at its actual value and taxed in the same manner as the other personal and real estate of the county. The question naturally arises, what is exempted by law? The answer is, all property, whether real or personal, having its location out of this state, is not subject to taxation, and is not, therefore, within this statute.

The intent of the legislature to deduct from the valuation the estate of individuals, personal property not within this state, rests on the same foundation as that of real estate abroad. That it was intended to except from the assessment of stock, property not subject to taxation, appears also from the fact that while it directs the stock to be valued, it excepts property that is exempt and provides for the assessment of the residue; such property is not to be valued as part of the capital stock of the corporation, nor is there any propriety in such an assessment.

The property owes nothing to the state for protection, while it pays taxes abroad in the country where it is located and used.

In the *People* agt. *Commissioners of Taxes* (23 *N. Y.*, 192, 223), DENIO, J., says: It would be equally their duty to inquire whether any of this property, into which the capital had been converted, was exempted by law from taxation. Again he says: " whether such exempt property is found in

Pacific Steamship Co. agt. Com'rs of Taxes and Assessments.

the hands of an individual or in the possession of a corporation taxed upon the actual value of its capital, the rule is the same; the exempt property is to be deducted from the aggregate valuation and the tax imposed upon the residue."

The only difficulty which suggests itself is, that the commissioners may have omitted to include in their valuation of the stock the value of the property abroad; and, therefore, they should not be required to deduct it now.

The rule in regard to the valuation of property is different from the inquiry as to indebtedness. In the one case the property is valued, in the other the indebtedness diminishes the value.

If the commissioners had not valued the property abroad, they should have so returned the fact. On the contrary they say they ascertained the actual value of the capital stock of the said company to be the sum of $10,000,000, and deducted therefrom the items before mentioned.

From this return no other conclusion can be formed than that the commissioners valued all the property of the corporation in valuing the stock, and made no allowance for exempt property, except what was deducted; in this we think they erred and that the relators are entitled to relief.

It does not, however, follow that the relators are entitled to a deduction from this assessment of the whole amount at which they value the personal property out of the state. The only order that can be made, is to set aside the assessment and refer the same back to the commissioners to correct the assessment by deducting the value of the personal property out of the state, unless the commissioners elect to accept the amount admitted by the relators, in schedule C, to be the sum at which they should be assessed. In that case the assessment will be corrected and affirmed for that amount.

E. L. Fancher and John R. Brady, JJ., concurred.